PARTIDO ESTADISTA REPUBLICANO ET AL., recurrentes, *v.*
JUNTA ESTATAL DE ELECCIONES, ETC., recurrida.

*Número:* 13      *Resuelto:* 24 de noviembre de 1967

*Arturo Ortiz Toro, Ángel Roberto Díaz, Nicolás Nogueras, hijo,
Víctor M. González Mangual, Julio Riera Morales, Nicanor
Martínez Vázquez, Antonio Quirós Méndez,* abogados de los
recurrentes; *José C. Aponte, Secretario de Justicia, y Rafael
A. Rivera Cruz, Secretario Auxiliar de Justicia,* abogados de
la recurrida; *Jaime A. García Blanco* y *Víctor M. Sánchez
Fernández,* abogados del interventor Partido de Oposición y
Renovación (antes Partido del Pueblo).

DECISIÓN DEL JUEZ PRESIDENTE SEÑOR NEGRÓN FERNÁNDEZ.

Éste es un recurso de apelación interpuesto para ante el
Juez Presidente bajo las disposiciones de la Sec. 13 (d) de

la Ley Electoral, según enmendada por la Ley Núm. 3 de 5 de octubre de 1965, Segunda Sesión Extraordinaria—16 L.P.R.A. sec. 19—por el representante del Partido Estadista Republicano en la Junta Estatal de Elecciones, contra una decisión del Superintendente General de Elecciones, emitida conforme a la disposición de la Sec. 12 de la Ley Electoral, según enmendada por la citada Ley Núm. 3 del 5 de octubre de 1965—16 L.P.R.A. sec. 13.

Se concedió a la Junta término para contestar el escrito titulado "Solicitud de Revisión" radicado por la parte recurrente, o alegar lo que a bien tuviere respecto a la misma y se solicitó por el Juez Presidente que la Junta elevara, en adición a otros ya remitidos por el Superintendente, varios documentos o copias certificadas de los mismos, los cuales fueron elevados oportunamente. La Junta compareció representada por el Secretario de Justicia radicando escrito titulado "Moción para Desestimar". Se convocó a las partes para oir sus argumentos sobre la referida moción y los méritos del recurso, audiencia que tuvo lugar el día 15 del corriente mes. En dicha fecha se radicó escrito de intervención a nombre del Partido de Oposición y Renovación (antes Partido del Pueblo) y, no habiendo objeción de las partes, se admitió la intervención de dicha agrupación política en la audiencia.

Mediante la decisión apelada—que por disposición de la propia Sec. 12 de la Ley Electoral se considera como la decisión de la Junta Estatal de Elecciones—se acordó, entre otros extremos, con el voto en contra del representante del Partido Estadista Republicano miembro de dicha Junta, que "bajo la dirección del Superintendente, de cada 25 peticiones de inscripción de una agrupación que solicita certificación como partido, se escoja una al azar y se compare la firma de esa petición con la de la petición de inscripción del elector peticionario y que sea el Superintendente quien le rinda a la Junta el informe correspondiente."

El referido acuerdo forma parte de una propuesta de tres apartados hecha por el Superintendente a la Junta en la sesión celebrada el 25 de octubre de 1967, que fue precedida por una exposición del Superintendente explicativa de su posición y razones para no acatar un acuerdo previo de la Junta—adoptado por unanimidad en sesión del 18 de octubre de 1967, por haber contado con los votos favorables de los dos miembros de la Junta de los partidos políticos en ella representados. Dicha exposición y propuesta, según surge de la transcripción de la sesión del 25 de octubre, fue la siguiente:

"En la reunión que celebrara la Junta Estatal de Elecciones, el día 18 de octubre de 1967, los representantes de los partidos políticos, Hon. Samuel R. Quiñones y Luis Ramos Rodríguez, acordaron que era necesario se cotejaran las firmas que aparecían en todas las peticiones de inscripción de candidaturas que habían sido aceptadas a las agrupaciones políticas en proceso de inscripción con el original de la petición de inscripción del elector que figura en los archivos de la Junta Estatal de Elecciones.

Consigné en el récord que en mi carácter de Superintendente General de Elecciones del Estado Libre Asociado de Puerto Rico, no acataría dicho acuerdo por entender que era nulo y contrario a ley.

Mi posición hoy es la misma que asumí en ese día ya que sostengo que un acuerdo de esa naturaleza no conduce a nada y que es imposible de poner en práctica. Ello equivale a no dar validez y pureza a la fe notarial y es el establecer que la Junta Estatal de Elecciones sea el único organismo de nuestro Gobierno donde se cotejen firmas que han sido prestadas ante notarios que actúan en su carácter de funcionarios investidos de tomar juramentos y de dar fe de los hechos y datos que figuran en un documento. Es también el poner en duda la honorabilidad y probidad de unos ciudadanos puertorriqueños a quienes la propia Junta les ha delegado esos poderes, ya que la Ley #3 aprobada en la 1ra. Sesión Extraordinaria de 5 de octubre de 1965, que enmendó la Sección 37 de la Ley Electoral, establece en su Artículo 2, Inciso C:

'Todo notario designado por la Junta Estatal de Elecciones bajo estas disposiciones actuará como delegado de dicha Junta al recibir los juramentos correspondientes'.

Delegar en nuestro idioma significa:

'Dar a una persona o entidad—dar una persona o entidad a otra la jurisdicción que tiene por su dignidad, *para que haga servicios y el conferirle su representación.'*

Es imposible el poner ese acuerdo en vigor porque la Junta carece de personal técnico (calígrafos) para determinar si una firma u otra en unos documentos es de la misma persona y es una realidad que las firmas nuestras que figuran en las peticiones de inscripción a la fecha en que nos inscribimos como electores hace muchos años difieren de las que hoy tenemos.

Consciente, no obstante, de que este organismo fue creado con el fin primordial de garantizar la puereza de los procedimientos electorales y que debemos todos los que formamos parte del mismo unir nuestras fuerzas para lograr armonía y comprensión y hacer de este organismo la base sólida sobre la cual se constituya un gobierno cuyo poder político emane del pueblo y sea la voluntad genuina, libre y democrática de ese pueblo y donde la libre participación del ciudadano se garantice en las decisiones colectivas, he creído conveniente y aconsejable en citarles a ustedes para lograr un acuerdo que sea razonable, justo y equitativo.

Deseo consignar que mi posición es invariable en el sentido de que las firmas autenticadas ante los notarios que hemos autorizado como delegados de la Junta son incuestionables lo que significa que en caso que resulte diferencia entre la firma de una persona y otra firma de la misma persona en las peticiones el beneficio de la duda se extienda a favor del elector y de la validez de la petición de inscripción de candidatura.

Tengo una proposición que hacer a la Junta, que consiste de tres apartados y que creo que llena a cabalidad lo que nosotros hemos venido discutiendo en la reunión que celebráramos anterior y que puede resultar en un acuerdo que sea tanto satisfactorio para ustedes como para el Superintendente General de Elecciones, y es la siguiente:

1.—Que la Junta—Que se determine, como ha sido siempre, que la Junta Estatal de Elecciones nunca ha tenido el propósito de obstaculizar la inscripción de los Partidos Nuevos.

2.—Que bajo la dirección del Superintendente, de cada 25 peticiones de inscripción de una agrupación que solicita certificación como partido, se escoja una al azar y se compare la firma de esa petición con la de la petición de inscripción del elector peticionario y que sea el Superintendente quien le rinda a la Junta el informe correspondiente.

3.—Que en los precintos donde se ha comprobado que no hubo ningún empleado del Partido Popular Democrático en el examen de las peticiones de inscripción del Partido de Oposición y Renovación, se designe por el Superintendente uno o más empleados de dicho partido para que realicen dicho examen.

Ésas son las tres proposiciones que hago a la Junta, para que este asunto se dilucide en la mejor forma posible y nosotros le garanticemos al pueblo de Puerto Rico un auténtico examen de estas peticiones de inscripción y que nos satisfaga a los tres.

Quiero añadir que con relación a esta tercera proposición, de que en los precintos donde se haya comprobado que no había ningún empleado del Partido Popular, se extienda esto también al Partido Estadista Republicano, en caso de que hubiere algún precinto donde algún miembro empleado del Partido Estadista Republicano no interviniera en el examen de peticiones de determinado precinto. Lo que quiero decir que esto abarca a los dos partidos, porque no recordé el hecho que me ha señalado el Sr. Salvador Díaz, en el sentido de que había un precinto—y puede haber más en la comprobación que se haga—que ustedes no tuvieron representación y en ese caso se les garantizaría lo mismo que aquí se provee."

El acuerdo de la Junta del 18 de octubre a que hace referencia el Superintendente en su exposición arriba transcrita tiene en verdad su origen en su planteamiento original hecho en sesión celebrada el 22 de septiembre de 1967 al traer a la consideración de la Junta el asunto de la inscripción de la agrupación política denominada Partido de Oposición y Renovación. Dicha sesión se desarrolló, en lo pertinente, en la siguiente forma:

"SR. PRESIDENTE: El primer asunto que yo quiero traer a consideración de la Junta es el relacionado con el Partido de Oposición y Renovación que ya ha presentado el número de peticiones exigido por ley para su reconocimiento. Este partido es

el partido que se denominaba Partido del Pueblo y nosotros en 22 de agosto de 1967 decidimos que ese nombre era muy similar al nombre que llevaba el partido principal de la Mayoría en el poder y que la insignia que tenía y usaba era una insignia que violaba la Ley Electoral en sus Secciones 37 y 32. Enterada dicha agrupación política de nuestra decisión, se nos comunicó después el cambio de nombre y de insignia: El Partido del Pueblo pasó a llamarse Partido de la Oposición y Renovación y en vez de las dos manos como insignia, adoptaron un sol naciente.

Yo quiero informar, a los fines de récord, que traigo conmigo un informe que les voy a dar a los Miembros de la Junta, relacionado con el número de peticiones que esta agrupación política ha radicado en los distintos precintos electorales de Puerto Rico y en cuyos precintos ellos han radicado más del cinco por ciento (5%) de las peticiones requeridas. Esta agrupación política, a los fines de récord, ha radicado 42,264 peticiones legales en más de la mitad de los precintos electorales de Puerto Rico y además ese cinco por ciento (5%) está cubierto legalmente, tal como provee la Sección 14 de la Ley Electoral, tomando en consideración aquellos precintos donde han cubierto el requisito de ley. El número de peticiones legales que se exige para que una agrupación política adquiera status de partido político es el cinco por ciento (5%) del total de votos para el cargo de Gobernador; o sea, 41,572 y esta agrupación pues ha sobrepasado ese número de peticiones requeridas, lo que quiere decir que ya tiene status de partido por petición, de acuerdo con la ley.

SR. LUIS RAMOS RODRÍGUEZ: Señor Presidente, he oído al señor Presidente pronunciar la frase 'radicado'.

SR. PRESIDENTE: Radicado y procesado. Ese informe, compañero, son las peticiones legales ya aceptadas, porque ellos han sobrepasado esa cuenta.

HON. LUIS RAMOS RODRÍGUEZ: ¿Me permite una pregunta el señor Superintendente?

SR. PRESIDENTE: Como no. Adelante.

HON. LUIS RAMOS RODRÍGUEZ: ¿Este partido, Partido Oposición y Renovación, cubrió [sic] con todos los requisitos de la Sección 37 de la Ley?

SR. PRESIDENTE: Sí, señor. O sea, cubrió [*sic*] con el requisito de presentar peticiones de electores debidamente inscritos en los precintos, etc.

HON. LUIS RAMOS RODRÍGUEZ: O sea, ¿radicaron con anticipación las candidaturas de los candidatos ante la Junta Estatal de Elecciones, las radicaron con anticipación y después entonces la Junta, después de cumplir con esos requisitos de la Sección 37, entonces la Junta de un número de notarios que le sometió, entonces le aprobó un número de notarios a ellos? Quiero decir que ése es uno de los requisitos para poderse convertir en partido.

SR. PRESIDENTE: Correcto. Ellos cumplieron con los requisitos legales que se requieren en la Sección 37. Nosotros tomamos precinto por precinto las peticiones legales que se han aceptado, para en cualquier momento que se quiera hacer una investigación o [*sic*] cualquier naturaleza. Eso está a disposición de los Miembros de la Junta.

HON. LUIS RAMOS RODRÍGUEZ: Otra pregunta. Estos mismos requisitos, exigencias de ley, para este partido convertirse en partido político, para esta agrupación convertirse en partido político, ¿esos mismos requisitos serán exigidos a cualquiera otra agrupación o cualquiera otro partido político para convertirse en partido político en Puerto Rico?

SR. PRESIDENTE: Correcto.

HON. LUIS RAMOS RODRÍGUEZ: Muchas gracias.

HON. SAMUEL R. QUIÑONES: Yo tengo que decir que, naturalmente, entiendo que cuando el Presidente de la Junta, Superintendente General de Elecciones afirma que ese partido al cual se refiere ya está debidamente inscrito, está expresando una opinión y proponiendo algo a la Junta, porque es la Junta la llamada a decir si eso es así o no. La Junta es el organismo llamado a pasar sobre cualquier asunto de este tipo. Éste es un requisito. Debe tener enterada a la Junta en su deber como Presidente.

Yo quiero decir que naturalmente no sabía que se iba a tratar este asunto hoy aquí. Es la primera noticia para mí que esto iba a ser objeto de tratamiento hoy. Estaba en la Agenda de los trabajos a realizar por la Junta; eso sólo. Ahora, sé que el compañero Ramos mucho más que yo, va a convenir conmigo: Yo debo, por ciertas razones, en cumplimiento de mi deber como representante de un partido en esta Junta, pero más todavía, como funcionario público, examinar la documentación ante la

Junta para ver de cuál ha sido el procedimiento administrativo y hacer todas las indicaciones en casos de esta naturaleza, pero sin que esto envuelva hecho alguno en menoscabo de la administración clara y eficiente de la Junta.

Solicito, como funcionario público y a los efectos de poder cumplir con mi deber como Miembro de esta Junta, tener un tiempo para el estudio correspondiente de esa documentación.

SR. PRESIDENTE: Yo no tengo objeción. Lo que sí quisiera llevar al récord es como se ha hecho este trabajo administrativamente. O sea, como se realizó esto, porque es bueno llevarlo al récord para beneficio del compañero Quiñones y más para beneficio del compañero. Ramos Rodríguez y mucho más para el beneficio del pueblo de Puerto Rico, para que se sepa cómo es que se hacen los trabajos aquí en la Junta.

Nosotros recibimos esas peticiones de inscripciones. Lo primero que vemos es si son, en primer lugar, notarios debidamente autorizados para tomar los juramentos. Si han sido radicados aquí en el término que provee la ley. Entonces esas peticiones se llevan al salón de trabajo y son examinadas una a una, para comprobar si el elector que firmó esa petición es un elector debidamente cualificado como elector inscrito en el precinto donde él dice serlo, etc., y luego que se comprueban todos los datos pues se aceptan aquellas que son legales, las que no cubren algún requisito de ley se revisan y se devuelven al organismo o la organización que las presentó y ése es el procedimiento que se sigue hasta que ellos llegan a presentar el número de peticiones legales que requiere la ley. Ése es el procedimiento que se ha seguido siempre hasta ahora en todas las organizaciones que pretenden lograr su inscripción de candidaturas y eso es lo que se ha hecho en este caso.

Cuando esta agrupación política empezó su inscripción nosotros teníamos miembros de los dos partidos realizando ese trabajo: del Partido Popular Democrático y del Partido Estadista Republicano, pero al aprobarse la Ley Núm. 1 el 23 de diciembre de 1966, la Ley de Plebiscito de 1967, pues como es natural tuvieron que dedicarse a hacer tarea especial del Plebiscito.

Yo lo que he hecho es informarle a la Junta lo que hay, y como es natural, pues la Junta es la llamada a hacer la solicitud que crea más conveniente. El compañero ha hecho una moción en el sentido de que se le dé un tiempo razonable para

examinar una documentación y le decimos al compañero que ponga el término más corto y que designe los funcionarios que él desee para que estudien esa documentación.

HON. LUIS RAMOS RODRÍGUEZ: Señor Presidente.

SR. PRESIDENTE: Adelante.

HON. LUIS RAMOS RODRÍGUEZ: Oyendo las manifestaciones del compañero licenciado Samuel R. Quiñones, como también así oí las manifestaciones del señor Superintendente en la forma en que se procesaban estas peticiones de inscripción, donde nos dijo que se comprobaba si el elector que firmaba la misma era elector del sitio donde indicaba en su petición de inscripción. Pregunto al señor Superintendente, si como parte de ese proceso también no se revisa esa petición de inscripción con la petición de inscripción del elector cuando se inscribió por primera vez, a ver si las firmas coinciden y si sabe leer y escribir o no y si aparece firmando una petición ahora cuando dijo en su petición anterior que no sabía leer ni escribir. Si se hace eso con cada uno de esos casos.

SR. PRESIDENTE: Sí, señor. Eso es así. Ése es uno de los procedimientos. Ésa es una de las cosas principales que se hacen para cotejar si en verdad es la persona que ha firmado.

HON. LUIS RAMOS RODRÍGUEZ: Entonces, señor Superintendente, estoy de acuerdo y secundo al licenciado Quiñones, compañero de la Junta, en su petición, porque en representación del Partido Estadista Republicano· también deseo hacer la investigación correspondiente con relación a ese particular y máxime yo que tomo posesión en el día de hoy de este cargo en la Junta Estatal de Elecciones. Que se dé suficiente tiempo para poder hacer el examen correspondiente."

En sesión celebrada el 6 de octubre siguiente se trajo nuevamente por el Superintendente a consideración de la Junta la cuestión relativa a la aceptación del Partido de Oposición y Renovación, reiterando en ella su posición de que dicha agrupación política había adquirido status de partido por petición y sosteniendo su criterio de que en el examen de las peticiones de inscripción de candidaturas no procedía el cotejo de las firmas de los peticionarios con las de las firmas en sus peticiones de inscripción como electores. Se

incluyó en el récord de esa sesión el informe preparado por el Superintendente—que le fuera solicitado ,en la sesión del 22 de septiembre—en cuanto al procedimiento administrativo seguido en el examen de dichas peticiones por el personal de la Junta. (¹) Dicho informe lee así:

"ESTADO LIBRE ASOCIADO DE PUERTO RICO
JUNTA ESTATAL DE ELECCIONES

SAN JUAN, PUERTO RICO

29 de septiembre de 1967

*INFORME*

Al:      Hon. Samuel R. Quiñones
De:      Junta Estatal de Elecciones
Sobre:   Examen de Peticiones de
         Inscripción de la Agrupa-
         ción Partido Oposición y
         Renovación

Esta agrupación radicó peticiones para el precinto de Culebras el día 17 de septiembre de 1965 con el nombre de Partido Social Cristiano y presentaron una insignia de dos manos cruzadas verticalmente. Posteriormente cambiaron el nombre a Partido Social Moral en 18 de octubre de 1965, después a Partido del Pueblo en 20 de julio de 1966 y últimamente adoptaron el nombre de Partido Oposición y Renovación con insignia de un Sol Naciente en 25 de agosto de 1967.

Radicaron las aceptaciones en o antes de radicar las peticiones de inscripción.

A medida que ellos iban radicando las peticiones de inscripción en la Junta Estatal de Elecciones, se le pasaban al Sr. Ángel Rengel, Encargado de Peticiones de Inscripción de Nuevos Partidos, quien las distribuía en

---

(¹) El referido informe fue recibido por el representante del Partido Popular Democrático en la Junta sólo dos días antes de la sesión del 6 de octubre, según hizo constar en el récord, y al representante del Partido Estadista Republicano le fue entregado en el curso de esa misma sesión.

el salón entre un grupo de empleados de los Partidos Popular Democrático y Estadista Republicano para que investigaran, en primer término si los peticionarios habían firmado a otras agrupaciones y en este caso se les rechazaban las repetidas con otras agrupaciones y en segundo término si las personas eran electores capacitados del precinto donde decían en la petición de inscripción. Las investigaciones se hacen por parejas de empleados por partidos y cada una de las peticiones, sean o no electores, son firmadas con las iniciales y el número de los empleados que hicieron las investigaciones.

El por ciento rebasó el 12% ya que ellos radicaron alrededor de 52,000 peticiones y de éstas se le aceptaron como legales 45,017, pero de éstas 2,753 son en precintos que no han completado el cinco por ciento o más y por lo tanto tienen 42,264 en precintos totalmente inscritos y esto es suficiente ya que la Ley exige el 5% de 831,451 o sea 41,572 en la mitad de los 87 precintos. Ellos tienen 42,264 en 75 precintos lo que sobrepasa los requisitos de Ley.

Respetuosamente sometido,

ERNESTO MIERES CALIMANO
Superintendente General de Elecciones"

En el curso de la sesión del 6 de octubre tuvo lugar el siguiente diálogo, relativo al alcance y procedimiento administrativo seguido en la revisión de las peticiones:

"HON. LUIS RAMOS RODRÍGUEZ: Pregunto al señor Superintendente, la segunda pregunta: ¿Cree el señor Superintendente que solamente se legaliza la petición de inscripción de un elector para nuevo partido con simplemente buscarlo en la lista para ver si es elector del sitio donde él jura que es elector?

SR. PRESIDENTE: Sí, señor, yo creo eso. Basta que se examine una petición, se compruebe que esa petición llena todos los requisitos de ley, se han llenado todos los apartados de la petición y se busca al elector en la lista correspondiente, ya es un elector legal, para que ahí la Junta no tenga que hacer más nada. Ésa es una petición completamente válida. En primer lugar,

porque las peticiones de inscripción son juradas ante los jueces, que son funcionarios autorizados para tomar juramentos; y en segundo lugar, porque si no son los jueces, es ante los notarios, que la Fe Notarial es suficiente.

De manera que si nosotros recibimos una petición de inscripción del elector Luis Rivera Rodríguez, que dice ser hijo de Juan, hijo de María, y nació en Aibonito, en Tal Fecha y su inscripción figura en el precinto de Aibonito, y nosotros comprobamos eso, eso para nosotros es suficiente y ésa es una petición legal; no tenemos que hacer más búsqueda de ninguna clase.

HON. LUIS RAMOS RODRÍGUEZ: Y esa Fe Notarial a que hace referencia el señor Superintendente, ¿ese Notario da fe de que conoce personalmente a ese elector?

SR. PRESIDENTE: No."

Finalmente, y luego de un prolongado debate, el representante del Partido Estadista Republicano en la Junta hizo la siguiente propuesta:

"HON. LUIS RAMOS RODRÍGUEZ: Señor Superintendente, para evitar que en el futuro se actúe en una forma distinta, en cuanto al récord legislativo de haber trasladado la inscripción de nuevos partidos a la Junta Estatal de Elecciones, yo propongo, señor Presidente, que desde esta fecha en adelante, para examinar las peticiones de inscripción de nuevos partidos, sea requisito indispensable de que cada una de esas peticiones de inscripción se examine con la petición de inscripción primitiva del elector, para ver si esa la firma y se comprueba todo de acuerdo con la petición de inscripción del elector cuyos archivos están aquí en la Junta Estatal de Elecciones, para evitar de que se cometan fraudes en la inscripción de nuevos partidos.

Ésa es mi proposición oficial aquí hoy en la Junta Estatal de Elecciones.".

Esta propuesta quedó pendiente para estudio y consideración en una sesión posterior. Acto seguido el representante del Partido Estadista Republicano radicó ante la Junta un extenso documento de objeciones e impugnación a las peticiones de inscripción de la agrupación política denominada Partido Nuevo, pidiendo el rechazo de la totalidad de las hasta entonces radicadas, sosteniendo que por razón de las

desviaciones sustanciales del procedimiento estatuido en la Sec. 37 de la Ley Electoral que evidenciaban los hechos alegados y las propias peticiones de inscripción, las mismas eran nulas y carecían de valor legal alguno por lo cual debían ser canceladas o devueltas a los interesados.

En la siguiente sesión de la Junta, que se celebró el 18 del propio mes de octubre, el representante del Partido Popular Democrático votó a favor de la propuesta hecha en la sesión del día 6 por el representante del Partido Estadista Republicano, que había quedado pendiente de votación. Con tal motivo, el Superintendente se expresó así:

"HON. ERNESTO MIERES CALIMANO: Bueno, de cualquier manera, yo quiero que conste en récord que el Superintendente no se solidariza con ese acuerdo que acaba de tomar la Junta Estatal de Elecciones por entender que no es un acuerdo que está conforme a derecho. No puedo apelar porque la propia ley contempla que cuando hay un acuerdo de los representantes de los partidos políticos ése es el acuerdo de la Junta."

Más adelante manifestó: "Yo no voy a acatar ese acuerdo de la Junta. Bueno, administrativamente no lo voy a acatar porque es un asunto nulo, sin validez ninguna y que yo no sostengo." Y en otro momento: "Yo no comparto eso. . . . Ni lo voy a hacer tampoco. Y voy a dar órdenes terminantes de que no se haga."

En esa propia sesión el representante del Partido Estadista Republicano hizo referencia específica a casos de alegadas irregularidades en la inscripción del Partido de Oposición y Renovación en varios precintos de la isla. Posteriormente, en 23 de octubre—y en apoyo de su impugnación y solicitud de rechazo de peticiones de inscripción del día 6 de dicho mes—radicó ante la Junta un Informe Complementario sobre alegadas violaciones de ley, irregularidades y fraude en la inscripción del Partido de Oposición y Renovación y del Partido Nuevo.

Fue el 25 de octubre—según anteriormente se ha indicado—que tuvo lugar la siguiente sesión de la Junta en la que hizo el Superintendente su propuesta de cotejar las firmas tomando al azar una de cada veinticinco peticiones de inscripción de candidaturas con las peticiones de inscripción como electores de los correspondientes peticionarios, la cual fue finalmente adoptada, como decisión de la Junta, con el voto en contra del representante del Partido Estadista Republicano, al día siguiente, 26 de octubre, en la continuación de la sesión del día anterior.

Ésa es la decisión objeto del presente recurso.

A pesar de que en su escrito de objeciones e impugnación de 6 de octubre de 1967 el representante del Partido Estadista Republicano solicitó el rechazo de la totalidad de las peticiones de inscripción a esa fecha presentadas ante la Junta por el Partido Nuevo por el fundamento, entre otros, de ausencia del *jurat*, separado del certificado a que se refiere la Sec. 37 de la Ley Electoral, señalando a su vez la insuficiencia del certificado en dichas peticiones para establecer de su faz la identidad del peticionario como acto valedero de la fe pública más allá de lo que el propio peticionario declaraba en cuanto a su nombre, fue en la propia sesión en que radicó dicho documento que momentos antes de hacerlo propuso el cotejo de las firmas de las peticiones de inscripción de candidaturas con las peticiones originales de inscripción de los electores. Esta propuesta fue, como hemos visto, la que se adoptó en la siguiente sesión del día 18. Aunque la cuestión de nulidad la incorporó el apelante a su recurso de revisión al hacer formar parte de su solicitud su escrito de 6 de octubre, no parece su propuesta de cotejo de firmas en todas las peticiones consecuente con su planteamiento de nulidad total por el vicio fatal alegado, de ausencia de *jurat* y de insuficiencia del certificado. En reconocimiento, sin embargo, al interés por él demostrado en que se cumpliera cabalmente, según lo entendía, con los requi-

sitos exigidos por la Ley para asegurar la debida identidad del peticionario con el elector que con igual nombre figuraba en las listas electorales, parece propio apuntar la posibilidad de que entendiera que la Junta no era el foro apropiado para ventilar el planteamiento de nulidad absoluta por ausencia del *jurat* e insuficiencia del certificado o que considerara que el cotejo de firmas propuesto como acción administrativa de la Junta convalidaría, si correspondían las firmas, los vicios de nulidad total que señalaba.

De todos modos, en la limitada esfera del recurso de apelación que para ante el Juez Presidente provee la Sec. 13(d) de la Ley Electoral no procede hacer en este caso expresiones de carácter judicial, sobre todo cuando las facultades que residen en la Junta Estatal de Elecciones, en su poder de dirección e inspección de las elecciones en Puerto Rico, pertenecen más bien al ámbito de la administración de la Ley, y no al de las determinaciones de hecho que puedan afectar derechos de los electores individualmente, en el cual caso su función está regida por el procedimiento estatutario previsto en la Ley y por la revisión judicial que en determinados casos se provee.

La decisión de la Junta objeto de este procedimiento, por su naturaleza, pertenece a la esfera de sus funciones administrativas. Si bien el deber público de la Junta, como organismo, y de cada uno de sus miembros individualmente, incluyendo al Superintendente General de Elecciones, que es su Presidente, en las diversas capacidades de su encomienda legislativa, es de velar porque la Ley se cumpla, en un gobierno de leyes y no de hombres, no debemos pasar por alto las limitaciones que en protección del fundamental derecho electoral del ciudadano, están implícitas y forman parte tanto del propio Poder Legislativo en lo que concierne a la razonabilidad de su reglamentación del proceso electoral como de los organismos y funcionarios encargados de la administración de las leyes reglamentadoras de ese proceso.

Es regla reiteradamente establecida que los requisitos que en el ejercicio del Poder Policiaco del Estado establece el Poder Legislativo para reglamentar la nominación de candidatos y la inscripción de partidos por petición deben ser cumplidos sustancialmente, y que desviaciones serias o ausencia de cumplimiento con dichos requisitos, si no son irrazonables, arbitrarios o confiscatorios del derecho al voto, pueden producir la inadmisibilidad de tales nominaciones o peticiones de inscripción, ante planteamientos oportunos en el foro apropiado.

■ Ante el reparo de la Junta recurrida de que el representante del Partido Estadista Republicano no cumplió, a su vez, con el requisito de Ley de que toda apelación de una decisión del Superintendente General de Elecciones para ante el Juez Presidente deberá hacerse en la misma sesión en que se tome la decisión apelada y antes de que se levante dicha sesión—cosa que no se hizo, ni se intentó hacer en este caso oportunamente, ya que luego de adoptado el acuerdo contra el cual votó el aquí apelante nada planteó ni anunció ante la Junta en cuanto a su propósito o deseo de apelar— no queda otra alternativa que coincidir con el criterio del Secretario de Justicia de que no procede el recurso por no haberse hecho siquiera un mero anuncio de la intención de apelar, durante la sesión y antes de terminarse la misma, aun cuando no se expusieran fundamentos de hecho y de derecho en respaldo de ese propósito. Hay ausencia total en el récord de la sesión del día 26 de octubre de indicio alguno que pudiera dar al Juez Presidente base para considerar que hubo un cumplimiento sustancial con la exigencia de Ley a ese respecto, aun interpretando en la forma más favorable al apelante el estatuto.

De la transcripción del récord de la sesión del día 26 de octubre aparece que al emitir su voto el representante del Partido Estadista Republicano sobre la propuesta de que se cotejaran las firmas en una de cada veinticinco peticiones

de inscripción de candidaturas, según se ha expresado antes, radicó un voto explicativo por escrito con las razones en que fundó su voto en contra de dicho acuerdo. Acto seguido pasó el aquí apelante a hacer otros planteamientos ante la Junta, que nada revelaban deseo, propósito o intención de apelar del acuerdo adoptado.

Luego de anunciar el Presidente de la Junta que había quedado aprobada su propuesta de hacer *spot check* en la forma que ya se ha dicho, el apelante se dirigió a éste en la siguiente forma:

"HON. LUIS RAMOS RODRÍGUEZ: Señor Presidente: Como ya terminó el primer asunto tengo otro asunto que plantear ante la Junta."

Continuó entonces el apelante y al terminar el asunto a que se referían sus anteriores palabras, preguntó el Presidente de la Junta: "¿Algún otro asunto?" a lo cual seguidamente respondió el apelante "Sí, como no." y continuó con otras observaciones relacionadas con el acta del día anterior.

Luego prosiguió con otras observaciones y planteamientos y si bien es cierto que hubo un momento en que el Presidente de la Junta manifestó que tenía un compromiso que atender, no podemos convenir con el apelante en que la sesión la terminó abruptamente el Presidente y que ello le impidiera cumplir con el requisito de la Ley de apelar en esa misma sesión y antes de que ésta terminara. Siendo éste un requisito de carácter jurisdiccional, su escrito titulado *Notificación de Intención de Apelar* radicado con posterioridad a haber terminado la sesión, aunque esa misma tarde, hace imperativa la desestimación del recurso. Hubiera bastado que, para proteger su derecho de apelación bajo las circunstancias de este caso, al quedar adoptado el acuerdo contra el cual votó, hubiera anunciado su intención de apelar aunque no hubiera expuesto—como no los expuso en su escrito radicado posteriormente—sus fundamentos de hecho y

de derecho, pues el voto explicativo que radicó por escrito al votar en contra del referido acuerdo contenía las razones y objeciones fundamentales en oposición al mismo.

En virtud de lo expuesto se desestima el recurso.

Lo decretó y firma

(Fdo.) Luis Negrón Fernández
*Juez Presidente*

Certifico:

(Fdo.) Joaquín Berríos
*Secretario*